IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ADAM BLUMBERG, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07- |
| | ) | |
| - against - | ) | |
| | ) | **Jury Trial Demanded** |
| ANGELO R. MOZILO, HENRY G. | ) | |
| CISNEROS, ROBERT L. DONATO, | ) | |
| HARLEY W. SNYDER, JEFFREY M. | ) | |
| CUNNINGHAM, MARTIN R. MELONE, | ) | |
| ROBERT T. PARRY, OSCAR P. | ) | |
| ROBERTSON, KEITH P. RUSSELL, | ) | |
| MICHAEL E. DOUGHERTY, DAVID | ) | |
| SAMBOL, KATHLEEN BROWN, and | ) | |
| COUNTRYWIDE FINANCIAL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

Plaintiff alleges, upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys and experts, except as to those allegations that pertain to the plaintiff himself which are alleged upon knowledge, as follows:

1.     The jurisdiction of this Court is founded upon 15 U.S.C. §78aa, 28 U.S.C. §1332, and 28 U.S.C. §1367. The plaintiff is a citizen of the Commonwealth of Pennsylvania. The defendants are all citizens of states other than Pennsylvania. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. It could exceed, actually, $3 billion.

2.     The claims herein arise under the laws of the several states including, particularly, the State of Delaware and also under §14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78n(a), Securities and Exchange Commission (SEC) Rule 14a-9, 17 C.F.R. §240.14a-9, Schedule 14A, 17 C.F.R. §240.14a-101 (Nov. 7, 2006), and Item 402 of Reg. S-K, 17 C.F.R. §229.402 (Dec. 29, 2006).

3.     Plaintiff brings this derivative action in the right of and for the benefit of Countrywide Financial Corporation (the "Company" or "Countrywide").

4.     This action is not a collusive one to confer jurisdiction on this court that it would not otherwise have.  This action does not allege securities fraud or any other fraud.  It does not seek to recover damages, but rather specific, equitable relief. This is an action for, *inter alia*, breach of fiduciary duty under Delaware law in that the directors, while in possession of material inside adverse information, caused the Company to repurchase more than 60 million shares of its stock at a price more than double its value, and at the same time they sold shares of the Company's stock at prices at more than double its value. This action is also based on excessive compensation under Delaware law and on the false or misleading proxy statement dated April 27, 2007 and distributed for the 2007 annual meeting of the Company's stockholders (the "2007 Proxy Statement"), the false or misleading proxy statement dated April 28, 2006, and distributed for the 2006 annual meeting of the Company's stockholders (the "2006 Proxy Statement"), and breach of contract.

5.     Plaintiff is a stockholder of the Company and was a stockholder at the time of the wrongs alleged herein, and has been such continuously since then.

6.    The Company is incorporated in the State of Delaware. Its principal place of business is not in Pennsylvania. The Company's stock is listed on the New York Stock Exchange. Its last fiscal year ended on December 31, 2006. As of September 30, 2007, Countrywide had outstanding 576,376,128 shares of common stock and 20,000 shares of preferred stock, not redeemable until August 22, 2017, convertible into common stock at $18 per share. As of October 30, 2007, the last reported sales price by the close of market of the common stock was $15.94 per share. Through its subsidiaries Countrywide is engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities, and insurance underwriting.

7.    Defendants Angelo R. Mozilo, Robert L. Donato, Harley W. Snyder, Jeffrey M. Cunningham, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell,  and David Sambol are all the members of the Company's board of directors. Michael E. Dougherty was a member of the Company's board of directors who did not stand for re-election in 2007. Henry G. Cisneros was a member of the Company's board of directors who resigned on October 18, 2007. Kathleen Brown was a member of the Company's board of directors who resigned on March 29, 2007.

8.    Defendant Angelo R. Mozilo is now, and has been for many years, the chairman of the board of directors and the Company's chief executive officer.

9.    David Sambol has been employed by the Company for more than 20 years. He is the president and chief operating officer.

3

10.     During the Company's fiscal year ended December 31, 2006, and in earlier years, defendants Harley W. Snyder, Michael E. Dougherty, Robert J. Donato, Jeffrey W. Cunningham, and Oscar P. Robertson were the members of the compensation committee of the board of directors.

11.     In earlier years, defendants Robert T. Parry and Keith P. Russell were also members of the compensation committee of the board of directors.

12.     Plaintiff has not made any demand on the Company's board of directors to institute this action against the individual defendants.  To the extent that the demand requirement is governed by Delaware law, if a demand is made and rejected, the stockholder's challenge must be not to the underlying transaction, but to the board's decision not to bring the lawsuit.  Delaware law thus substantially alters the nature of a derivative plaintiff's claim where demand has been made and conversely gives shareholders considering litigation good reason not to make demand.

13.     A majority of the board is either interested in the transactions and events alleged herein, or they otherwise lack independence. Of the nine members of the board, seven of them sold shares of the Company's stock for millions of dollars while in possession of materially adverse inside information, during the same period that they (excluding David Sambol who was not a member of the board of directors until September 26, 2007) had caused the Company to redeem approximately 10 percent of the Company's common stock. The price at which the directors caused the Company to

4

purchase its stock and at which they individually sold that stock was more than double its value.

14.    Of the nine members of the board, Angelo R. Mozilo is interested in the materially false or misleading statements and omissions concerning his compensation because they create the illusion that he is compliant with his statutory and fiduciary duties of disclosure and his fiduciary duties not to accept excessive compensation. At the same time, he is financially interested in receiving more compensation. Of the eight other members of the Company's board of directors, five of them lack independence because they were members of the board's compensation committee during the years when the compensation committee paid CEO Mozilo amounts greater than what was due him, for which they are liable. They are defendants Snyder, Cunningham, Donato, Robertson, and Parry. A sixth member of the Company's board of directors, David Sambol, lacks independence because he is a Company officer whose compensation must be approved by a majority of the board. His position as a Countrywide officer is his principal occupation, and he would not jeopardize his occupation and its compensation, reported as $11,965,711 in the 2007 Proxy Statement, by voting to bring this action against it.

15.    Even in the absence of a traditionally interested (or non-independent) board, demand is excused under the facts at bar.

16.    The demand requirement and its exceptions are to encourage intra-corporate resolution of disputes and to obtain the business judgment of the board on whether the litigation is in the best interest of the corporation and its shareholders.

5

However, where a stockholder sues the board of directors over an act that is not the product of a valid exercise of business judgment, such as waste, or that is not a decision concerning the management of the business and affairs of the corporation, Delaware law excuses demand. Delaware law excuses demand whenever the challenged act of the board is not the product of a valid exercise of business judgment, regardless of whether a majority of the board is disinterested and independent. The board's causing the Company to repurchase its stock, its conduct concerning the misrepresentations and omissions in proxy statements, its conduct in violating the express terms and provisions of the program for compensating the CEO, its excessive compensation of the CEO, and in committing acts in violation of their duty of loyalty are not matters of business judgment, and they are not protected by the business judgment rule for the following reasons:

(a)     The board of directors' authorization for the Company to repurchase its own common stock was given while a majority of the board was selling stock based on materially adverse inside information. They caused the Company to repurchase its stock at a price that was more than double its value. Such conduct is waste. The board is not protected by the business judgment rule for the repurchase of the Company's common stock.

(b)     When, for the stockholders' annual meeting, a corporate board solicits stockholders' votes for directors, the board owes the stockholders a statutory and fiduciary duty of full and fair disclosure, meaning that all material facts must be disclosed and no material facts may be omitted. This duty of disclosure is a thing apart from the

6

duty and authority to deal with the business and property of the corporation. Courts give deference to a corporate board of directors as to questions of management of the corporation's business, but not as to questions of the board's performance of its disclosure duties, and for three reasons. First, a board's decision, even in good faith, to misstate or to omit a material fact cannot be defended on the grounds that reasonable persons could differ on the subject. Second, although courts may not be well suited to making business decisions, courts are well suited to deciding questions concerning the quality of, and circumstances surrounding, disclosures. Third, allegations that a proxy statement has materially false or misleading representations and omissions could raise issues as to the honesty and good faith of the directors.

(c)    As with Delaware law, under federal policy, there is no need for prior demand on the board of directors with respect to the claim of misrepresentations and omissions in the 2007 Proxy Statement and the 2006 Proxy Statement.

(d)    At bar, the 2007 Proxy Statement and the 2006 Proxy Statement contain materially false or misleading statements and omissions concerning the dollar value of options granted to executive officers that vested in 2006, and the methods and procedures for determining the CEO's pay, under federal law and under Delaware law. It also materially understates the total compensation of the CEO.

(e)    The entire board is neither disinterested nor independent since every member of the board is liable for the material misstatements and omissions in the Proxy Statement.

7

(f)      The individual defendants have sought to entrench themselves as members of the Company's board of directors by establishing and maintaining a staggered board, and by soliciting proxies for their own re-election.

(g)      The board of directors has committed waste in the matter of executive pay. Waste is egregious misconduct that is not protected by the business judgment rule, and it provides an excuse for not making demand. The past and present members of the compensation committee, who are a majority of the full board of directors, granted stock options with unauthorized vesting schedules and stock options that were unauthorized under the CEO's employment agreement. Also, the compensation committee selected a group of comparable companies by which to assess the reasonableness of the total executive compensation, but they paid out materially, indeed shockingly, greater amounts than what the comparable companies paid.    CEO Mozilo was interested in these payments.

17.      From 1991 until approximately mid-2005, in all metropolitan statistical areas in the United States, as defined by the United States Census Bureau, the weighted average single family residence home price index experienced an increase in the percentage of year over year increase, calculated for each month, from less than one percent to nearly 13 percent. Beginning mid-2005 the percentage of year over year increase began a steady decline. By the beginning of the fourth quarter of 2006, the percentage of year over year increase was less than four percent. The  defendants knew that this decrease was correlated to a material increase in the delinquency rate on all

8

mortgage loans made by Countrywide and that its assets had all suffered material declines in value.

18.    The correct course of action for the Company's directors at the beginning of the fourth quarter of 2006 was to write down its assets and reflect a reduction in Countrywide's net income. This would have resulted in a material decrease in the price of Countrywide's common stock to reflect its value. Instead, however, the individual defendants Mozilo, Cisneros, Donato, Snyder, Cunningham, Melone, Parry, Robertson, Russell, Dougherty, and Brown, acting as Countrywide's board of directors, authorized a program to repurchase its common stock and on November 9, 2006 caused Countrywide to purchase 38,639,876 shares for $1,508,596,000 or $39.04 per share. On November 9, 2006, the Company's stock went ex- dividend in the amount of $0.150 per share, and the opening, high, low, and closing prices for Countrywide's common stock were, respectively, $39.08, $39.10, $38.40, and $38.82, and the volume was 1,961,600 shares. So, not only did the directors make Countrywide pay the purchase price of the stock, on the day before the purchase they also made it pay the dividend of $5,795,981.40. Because of these market conditions, Countrywide's repurchase of 38 million shares of its own stock helped to keep the price up, to the benefit of the selling directors and defendant Sambol.

19.    Pursuant to the program to repurchase stock, during the second quarter of 2007, defendants Mozilo, Cisneros, Donato, Snyder, Cunningham, Melone, Parry, Robertson, Russell, and Dougherty, acting as Countrywide's board of directors caused it

9

to purchase 21,503,512 shares of its common stock for $863,556,000, or $40.16 per share. Because of market conditions this repurchase by Countrywide helped to keep the price up, to the benefit of the selling directors and defendant Sambol and, possibly, defendant Brown.

20.    On September 30, 2006, Countrywide had 616,748,918 shares outstanding. Since then, in 2006 and 2007, it purchased a total of 60,143,388 of its shares, or 9.75% of the number of shares outstanding. The individual defendants caused Countrywide to pay substantially more for its stock than its value. As the market has learned the true state of conditions at Countrywide, the price of its stock has fallen to approximately half of the price that Countrywide was forced to pay.

21.    Countrywide's repurchase of any of its own stock was a material deviation from its previous history. Countrywide's financial statements reflect that, at least since March 1, 1991, it had never redeemed or repurchased any of its common stock until November 9, 2006. In 2004, there were two separate special meetings of Countrywide's stockholders, on January 9 and August 17, to vote upon proposals to increase the number of authorized shares of common stock under the certificate of incorporation. In each instance the board of directors solicited stockholders' proxies for the proposals. In each instance the proxy statement omitted to state that common stock would be repurchased by the Company. The sudden repurchases of its own stock in such large amounts and near its peak price has not been explained by any of the defendants.

10

22.     After the directors learned that Countrywide's assets and business were exposed to the market risks coincident with a declining rate of increase in the weighted average single family residence home price index, nine of the 12 individual defendants, seven of whom are now members of the board of directors, sold thousands of their own shares of Countrywide common stock for millions of dollars. CEO Mozilo sold 8,256,964 Countrywide shares for more than $304 million since July 6, 2005, and through and after the time that the individual defendants forced Countrywide to repurchase its own stock. Defendant Sambol sold 1,009,825 Countrywide shares between July 8, 2005 and July 19, 2007 for $37,711,725.66. Defendant Dougherty sold 170,929 Countrywide shares for more than $6.8 million since November 29, 2006, and after the time that the individual defendants forced  Countrywide to repurchase its own stock. Defendant Snyder sold 120,000 Countrywide shares for $4,718,040 between April 19, 2006 and December 19, 2006. Defendant Robertson sold 272,000 Countrywide shares between November 15, 2005 and July 27, 2007 for $10,215,668. Defendant Cunningham sold 75,000 Countrywide shares for more than $3 million between April 3, 2006 and February 2, 2007. Defendant Donato sold 54,142 Countrywide shares for $2,142,068 in October and December 2006. Defendant Cisneros sold 111,479 Countrywide shares between August 8, 2005 and May 30, 2007, for $4,173,776.20. Defendant Russell sold 10,800 Countrywide shares on December 12, 2005 for $371,243.52.  Defendant Brown resigned from the board of directors with 11,727 shares of Countrywide stock that she acquired as

partial compensation for membership on that board. She has not publicly disclosed whether she sold those shares.

23.    And then, on August 22, 2007, the directors caused Countrywide to issue 20,000 shares of 7.25 percent redeemable preferred stock, convertible into common stock at $18 per share, in exchange for $2,000,000,000 in cash. This amount of cash is $372 million less than the directors caused Countrywide to pay to purchase its stock, without counting the non-tax deductible preferred dividends of $145 million per year. If all the preferred stock is converted, Countrywide will issue 111,111,111, common shares. At $18 per share, the loss to Countrywide is $1,289,500,817, without counting the preferred dividends.

24.    The preferred stock is redeemable, but not until August 22, 2017. The annual difference in the preferred dividends and the common dividends on the repurchased shares is $145,000,000 less $36,086,032.80, or $108,913,967.20. The present value of the dividend differential for 10 years, assuming an annual interest rate of 7%, is approximately $765 million.

25.    The total injury to Countrywide resulting from the purchase and sale of its stock is the loss of $1,289,500,817 plus the present value of the dividend differential of $765 million plus the $372 million difference between the purchase price of its common stock and the issue price of its preferred stock, plus the amount that equity will compel as recovery for the defendants' insider sales. The total could be approximately $2.8 billion and perhaps more.

26.     The individual defendants authorized the distribution of the 2007 Proxy Statement to solicit the proxies of Countrywide's stockholders for, *inter alia*, the re-election to the board of defendants Henry G. Cisneros, Robert J. Donato, and Harley W. Snyder for a term expiring in 2010. Countrywide's directors have given themselves, and caused to persist, a staggered board of directors at Countrywide, whereby approximately one-third of the board stands for election each year for a three-year term. A staggered board assists the defendants in entrenching themselves as directors.

27.     The individual defendants permitted the use of their names in the 2007 Proxy Statement and in the 2006 Proxy Statement to solicit proxies.

28.     With respect to the solicitation of proxies for the annual meeting of stockholders on June 13, 2007, the 2007 Proxy Statement contains materially false or misleading statements and omits material facts concerning the compensation of the Company's CEO, defendant Angelo R. Mozilo, as described below. The purpose of a proxy statement is to inform the stockholders, not to challenge their critical wits. As a result, the 2007 Proxy Statement renders the stockholders unwitting agents of self-inflicted damage.

29.     The 2007 Proxy Statement violates Schedule 14A and Regulation S-K. Item 8 of Schedule 14A, 17 C.F.R. §240.14a-101, pertains to Compensation of Directors and Executive Officers. It expressly requires that a proxy statement must furnish the information required by Item 402 of Reg. S-K when the stockholders' proxies are solicited for the election of directors.

30.    Reg. S-K (Item 402(c)) requires that the proxy statement report the compensation of Named Executive Officers, as defined in 17 C.F.R. §229.402(a)(3), in a Summary Compensation Table broken into categories of compensation, e.g., salary, bonus, etc. 17 C.F.R. §229.402(c)(2)(vi) expressly requires the proxy statement to state the dollar amount recognized for financial statement reporting purposes in accordance with FAS 123R for stock option grants to the Named Executive Officers in the last fiscal year. FAS 123R is a Statement of Financial Accounting Standards issued in December 2004 by the Financial Accounting Standards Board of the Financial Accounting Foundation. FAS 123R establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services. FAS 123R focuses primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions.

31.    For stock options, FAS 123R requires the use of a reliable, sound valuation technique, but it does not require a particular technique or model. It does, however, refer to the Black-Scholes-Merton option pricing model, lattice or binominal models, and the Monte Carlo simulation technique. Instruction 1 to 17 C.F.R. §229.402(c)(2)(vi) states, as to the dollar amounts of stock options:

> [I]nclude a footnote disclosing all assumptions made in the valuation by reference to a discussion of those assumptions in the registrant's financial statements, or discussion in the Management's Discussion and Analysis. The sections so referenced are deemed part of the disclosure provided pursuant to this Item.

32.    The SEC stated in Release 33-8765, 34-55009, 2006 WL 3782720, at *4

(December 22, 2006):

> Under FAS 123R, while the compensation cost is initially
> measured based on the grant date fair value of an award, it
> is generally recognized for financial reporting purposes
> over the period in which the employee is required to
> provide service in exchange for the award (generally the
> vesting period). ...

> [W]e have concluded that a combination of disclosure of
> the compensation cost associated with equity awards as that
> cost is recognized in the financial statements in the
> Summary Compensation Table, combined with disclosure
> of the grant date fair value of those awards on an [sic]
> grant-by-grant basis in the Grants of Plan-Based Awards
> Table, would prove a fuller and more useful picture of
> executive compensation than our recently adopted rules.

33.    The Summary Compensation Table in the 2007 Proxy Statement

represents that the dollar value of the Option Awards to CEO Mozilo  was $23,047,104.

This representation is materially false or misleading, for the correct dollar value is

$33,287,436.

34.    Footnote 2 to the Summary Compensation Table in the 2007 Proxy

Statement represents:

> The amounts reported reflect the dollar amount recognized
> for financial statement reporting purposes for Fiscal 2006
> in accordance with FAS 123(R) and may include amounts
> from awards granted prior to and during fiscal 2006.
> Assumptions used in the calculation of these amounts are
> included in note 2, summary of significant accounting
> policies, to our audited financial statements for Fiscal 2004,

2005 and 2006, which are included in our Annual Reports
on Form 10-K for Fiscal 2004, 2005 and 2006.

In 2003, the Company granted to CEO Mozilo options on 2,000,002 shares. These options vested at the rate of 1/3 in each of the years 2004, 2005, and 2006. Based on the Black-Scholes value of the options of $4.47 per share, the valuation method the Company used as reported in Note 2 to the financial statements in the Company's Form 10-K for 2004 and 2005, the grant had a value of $8,940,009, one-third of which is $2,980,003. In 2004, the Company granted to CEO Mozilo options on 1,400,000 shares, which vested at the rate of 1/3 in each of 2005, 2006, and 2007. Based on the Black-Scholes value of the options of $11.09 per share, as reported in Note 2 to the financial statements the Company's Form 10-K for 2005 and 2006, the grant had a value of $15,526,000, one-third of which is $5,175,333. Because these dollar amounts of stock options vested in 2006, these amounts should have been included in the amount shown as the dollar value of the Option Awards in the Summary Compensation Table of the 2007 Proxy Statement. A reasonable stockholder, however, cannot determine whether they were.

35.    Footnote 4 to the Summary Compensation Table in the 2007 Proxy Statement represents that, since CEO Mozilo was eligible for retirement in 2006, the stock option that the Company granted to him in 2006 would have vested had he retired in 2006. Accordingly Footnote 4 represents that the full grant date fair value of the 2006 stock option is reportable in the Option Awards column. Again, a reasonable stockholder cannot determine whether it was reported.

16

36.    The Grants of Plan-Based Awards Table in the 2007 Proxy Statement reports that the value of CEO Mozilo's 2006 stock option on 1,400,000 shares is $19,012,000. Adding that amount to the dollar value of the 2003 and 2004 stock option grants that vested in 2006 equals $27,167,336.

37.    Using the assumptions for expected life, volatility, interest, and dividend yield in Note 2 to the financial statements in the Company's 2006 Form 10-K, as directed by Footnote 2 to the Summary Compensation Table in the 2007 Proxy Statement, Countrywide applied a lattice model instead of Black-Scholes to value the stock options that it granted CEO Mozilo on April 3, 2006. The 2007 Proxy Statement, even with its reference to the 2006 financial statement, omits facts necessary to determine how it calculated the dollar value of Option Awards to CEO Mozilo as represented in the Summary Compensation Table.

38.    The Company's 2006 Proxy Statement reports that on April 1, 2005 the Company granted stock options on 1,400,000 shares to CEO Mozilo and that those options had a grant date present value of $18,360,300.

39.    The 2006 Proxy Statement also represents that the stock options that the Company granted to CEO Mozilo and, indeed, to all persons eligible, "were immediately exercisable in anticipation of new accounting rules that apply to stock options under Financial Accounting Standards 123(R)." These statements were in the Compensation Committee Report on Executive Compensation that was specifically incorporated by reference into the 2005 Form 10-K. The representation that the stock options granted to

CEO Mozilo "were immediately exercisable" omits to disclose that the employment agreement between the Company and CEO Mozilo dated March 1, 2001 required that any stock options granted to CEO Mozilo could not be immediately exercisable but instead "shall vest as to one-third of their respective underlying shares on each anniversary date of grant." Moreover, vesting was conditioned upon CEO Mozilo, as of the vesting date, being an employee of the Company or a consultant to the Company.

40.    The omission in the 2006 Proxy Statement of the facts concerning the immediate exercisability of CEO Mozilo's stock option was material, for the directors had solicited the votes of the stockholders for the re-election to the board, for a three-year term, of defendants Cunningham, Melone, and Parry, and of Kathleen Brown, who resigned from the Company's board on March 29, 2007, citing both personal and business reasons but without elaboration. Defendant Cunningham was then a member of the Company's board's compensation committee. Disclosures concerning the compensation of the CEO are required when directors are elected and are, therefore, material.

41.    Neither the compensation committee nor the full board had the authority to grant stock options in contravention of the requirements of the employment agreement dated March 1, 2001, just as they would have no authority to backdate stock options. Accordingly, the 2007 Proxy Statement's Summary Compensation Table wrongfully omitted to include one-third of the dollar value of CEO Mozilo's 2006 stock option in its statement of Option Awards. That amount is $6,120,100.

18

42.    The total of amounts that should have been reported for CEO Mozilo's stock options that vested in 2006 are as follows:

| | | |
|---|---|---|
| 2006 | | $19,012,000 |
| 2005 | | 6,120,100 |
| 2004 | | 5,175,333 |
| 2003 | | 2,980,003 |
| | Total | $33,287,436 |

The amount actually reported was $23,047,104 for a difference of $10,240,332. This is a material difference, for the actual amount is 44 percent greater than disclosed.

43.    One of the most important improvements in the SEC's new method of disclosing corporate executive compensation is the inclusion of a final tally in the Summary Compensation Table. For each Named Executive Officer the Table provides a total dollar amount of each of the categories of compensation. In the 2007 Proxy Statement the Total Compensation for CEO Mozilo for the fiscal year ended December 31, 2006 is represented to be $48,133,155. This is materially false, for it is understated by the amount omitted from the dollar value of the Option Awards, or $10,240,332. The true total is $58,373,487, and it is 21 percent greater than the reported Total.

44.    The representation in the 2006 Proxy Statement that the 2005 stock options were immediately excercisable "in anticipation of new accounting rules that apply to stock options under Financial Accounting Standards 123(R)" omits to disclose that those "new accounting rules," which had been issued in December 2004, were to require the Company to treat those stock options as an expense and were to give the

19

stockholders a better understanding of the Company's cost of compensating its officers and employees. That omission led the Company's stockholders into a false sense of security to understand that the compensation committee was acting in the best interests of the Company and its stockholders when the opposite was true. That omission in the context of an election of directors was material, because the actual effect in making the 2005 stock options immediately exercisable was to under-report executive compensation in 2006, 2007, and 2008.

45.     The 2007 Proxy Statement represents that CEO Mozilo's stock options on 1,400,000 shares in fiscal year ended December 31, 2006 "were granted in accordance with the provisions of his employment agreement." This statement is materially false. The grants to CEO Mozilo of options on 1,400,000 shares had been required under the employment agreement dated March 1, 2001, but only "during the term" of that agreement, which expired on February 28, 2006. The Company granted those stock options on April 3, 2006, after the March 1, 2001 agréement had expired. Mozilo's employment agreement dated September 2, 2004, which was in effect when the Company granted the options on 1,400,000 shares, had no provision requiring the grant of those options. The 2006 Proxy Statement, dated April 28, 2006, was materially false or misleading in that it addressed CEO Mozilo's equity based compensation, but it omitted to disclose those 1,400,000 stock options. CEO Mozilo should account to the Company for the value of those 1,400,000 stock options granted in 2006, such value to be determined in accordance with FAS 123(R), or the court should enter an order cancelling

those stock options on 1,400,000 shares granted in 2006, whichever method provides the Company with the greater recovery.

46.    The members of the Company's board of directors have statutory and fiduciary duties of disclosure to correctly report how executive pay is determined and to disclose all the material facts concerning the differences in the CEO's pay and the CEO's executive pay at the comparable, peer group companies. It is not the burden of the Company's stockholders to research these facts, but rather the duty of the board to disclose these differences and the reasons for them.

47.    Under Delaware law, directors and officers have a fiduciary duty to disclose all material facts when they seek stockholder action or communicate with stockholders. The fiduciary duty to disclose often overlaps and exceeds the affirmative duties to disclose under the federal securities laws. Where the federal laws mandate disclosure, Delaware law requires that any disclosure made be full and fair. There need not be an affirmative disclosure requirement under federal law, however, for a fiduciary duty to disclose to arise under Delaware law. Moreover, under Delaware law, stockholders are entitled to rely on the truthfulness of communications to them even if they are unrelated to requests for stockholder action. To the extent that plaintiff has a claim under federal law, he has an even greater claim under Delaware law.

48.    Unless the court enters an injunction requiring corrected disclosures in this and future proxy statements, the directors will be elected based on materially false or misleading proxy statements.

21

49.    These misrepresentations and omissions are presumptively material for they refer to statements expressly and affirmatively required by SEC regulations.

50.    All the individual defendants were negligent in that they knew or should have known that the aforesaid representations and omissions in the 2007 Proxy Statement and the 2006 Proxy Statement were materially false or misleading. To the extent that this complaint prays for injunctive relief to correct materially false or misleading representations, such remedies are available even if they were not negligent.

51.    The misrepresentations and omissions have caused injury to the Company. Good disclosure is valuable because it lowers the Company's cost of capital, and bad disclosure injures the Company because it does the opposite. The SEC, in Executive Compensation Disclosure, 2006 WL 3782720 at *15 (Dec. 22, 2006) (concerning improved disclosure of stock options values in proxy statements) said:

> Although [the value of disclosure is] difficult to quantify, disclosure under the amendments will benefit investors in terms of the transparency, completeness and accessibility of executive compensation disclosure.

It is difficult, but not impossible. If the directors do not correct these disclosures, they should account to the Company for the injury that it sustains.

52.    In granting stock options in 2006 to CEO Mozilo, the compensation committee failed to follow his employment agreement.

53.    The members of the compensation committee have fiduciary duties of loyalty to the Company to follow contractual limits for granting stock options. Failure to perform those duties constitutes waste for which they must account to the Company.

54.    CEO Mozilo as an officer and director of the Company also has fiduciary duties of loyalty to the Company. Accepting stock options that were not authorized in his employment agreement is a breach of those duties for which he must account to the Company.

55.    The payments made for fiscal year ended 2006 to CEO Mozilo are grossly excessive, even as materially understated in the 2007 Proxy Statement. In addition, the payments made to CEO Mozilo for fiscal years ended 2004 and 2005 are grossly excessive, even as sanitized by the peer group references in the 2007 Proxy Statement.

56.    The 2007 Proxy Statement represented that the compensation to CEO Mozilo was $48,133,155 in fiscal year ended 2006.

57.    For the fiscal years 2004 and 2005, the compensation to CEO Mozilo, as calculated under 17 C.F.R. §229.402(c), effective December 29, 2006, and if his 2005 stock options were accounted for correctly, were, respectively, approximately $33 million and $32 million.

58.    The 2007 Proxy Statement represents:

> In order to review specific pay levels at our peer companies, we gather information about executive compensation and practices using publicly available information as well as published compensation surveys. We gather information for all elements of direct compensation,

> including base salary, annual incentive bonuses and long-term incentives. Not every peer company reports information for executive positions that are similar to ours. Therefore, we also review pay levels and practices among a broader group of similarly-sized financial services organizations using published compensation surveys. For this review, depending on availability of data, we generally consider organizations with assets of $50 to $100 billion. Asset size tends to be the financial metric most closely correlated to pay practices among diversified financial companies, and it is the primary financial scope measure provided in financial services industry compensation surveys.

This representation is materially false or misleading for, while asset size may tend to be the financial metric most closely correlated to pay practices among diversified financial companies, the CEO pay at Countrywide correlates to much larger companies.

59.    The 2007 Proxy Statement represents that the compensation committee has compared the compensation of CEO Mozilo to the compensation at a peer group of companies and that the committee has historically targeted his compensation at or above the 90th percentile for his peer group.   These representations are materially false or misleading because the 2007 Proxy Statement omits to disclose how much higher the pay was to the Company's CEO than to the CEOs at the peer group firms. The differences are so great as to shock the conscience. Omission of these facts renders the 2007 Proxy Statement materially false or misleading, because it represents that the Company's CEOs' pay is within the range of the CEOs' pay at the peer group companies.

60.    Countrywide's total assets at year end 2005 and 2006 were, respectively, approximately $175 Billion and $200 Billion. In its peer group were the following:

24

| Year end 2006 | In Billions | | |
|---|---|---|---|
| | Assets | Stockholders' Equity | Net Income |
| Bank of America Corp | $1,488 | $130 | $21 |
| Citigroup, Inc. | 1,884 | 119 | 22 |
| J.P. Morgan Chase | 1,351 | 116 | 20 |
| Merrill Lynch & Co. Inc. | 841 | 39 | 7 |
| Countrywide | 200 | 14 | 3 |

The reported 2006 compensation of the CEO at each of the foregoing firms was, approximately, as follows:

| | |
|---|---|
| Bank of America Corp | $28 million |
| Citigroup, Inc. | $26 million |
| J.P. Morgan Chase | $39 million |
| Merrill Lynch & Co. Inc. | $48 million |
| Countrywide | $48 million |

As the 2007 Proxy Statement omits to disclose, CEO Mozilo heads a company that has materially smaller financial metrics than the high paying companies in its peer group, but Countrywide pays him more than the large peer group companies pay their CEOs.

61.    Also in Countrywide's peer group were the following companies with financial metrics far more comparable than those in ¶50:

| Year end 2006 | In Billions | | |
|---|---|---|---|
| | Assets | Stockholders' Equity | Net Income |
| Washington Mutual, Inc. | $346 | $27 | $14 |
| Sun Trust Banks, Inc. | 182 | 18 | 2 |
| National City Corporation | 139 | 13 | 2 |
| Countrywide | 200 | 14 | 3 |

The reported 2006 Compensation of the CEO at each of the foregoing firms was, approximately, as follows:

| | |
|---|---|
| Washington Mutual, Inc. | $14 million |
| Sun Trust Banks, Inc. | 8 million |
| National City Corporation | 9 million |
| Countrywide | 48 million |

As the 2007 Proxy Statement omits to disclose, the peer group members that have financial metrics that are similar to those of Countrywide pay their CEOs materially less than what Countrywide pays CEO Mozilo.

62.    The members of the compensation committee of the Company's board of directors owe the Company fiduciary duties of loyalty, including the duty to pay only reasonable compensation to executives.

63.    CEO Mozilo has the fiduciary duty to accept only reasonable amounts of pay. His acceptance and retention of more than reasonable amounts of pay constitutes a breach of that duty and unjust enrichment.

64.    The 2007 Proxy Statement represents that the annual cash incentive for CEO Mozilo is his incentive for the prior fiscal year multiplied by the ratio of the fully diluted earnings per share of the current fiscal year to that of the prior fiscal year. But the earnings per share for the fiscal year 2006 was materially overstated because of the failure to take write downs for the materially adverse developments beginning in 2005 that were fully apparent to the officers and directors of Countrywide by the end of 2006. By then, the rate of increase in the weighted average single family residence home price index had declined to two percent and, according to Countrywide's calculations, the risk

26

of delinquency had further increased for all mortgage loans held by Countrywide. Accordingly, the annual incentive paid to CEO Mozilo was excessive, and he should account to the Company for that excess.

65.    As CEO Mozilo has acknowledged, Countrywide needed a superior spirit to guide it through these difficulties, and he is not that. Yet the board paid him as though he were. CEO Mozilo not only failed to lead, but, when he had materially adverse inside information, he sold Countrywide common stock to reap more than $304 million in proceeds. That stock was worth less than half of what Mozilo and other  defendants received at the same time that they caused the Company to repurchase shares for $1.3 billion more than they were worth. This misconduct shocks the conscience. He and the board should account to the Company for the losses on the repurchases of its common stock, for their insider trading, and for CEO Mozilo's excessive compensation.

66.    The aforesaid breach of duties of disclosure and loyalty have injured the Company.

WHEREFORE, plaintiff prays for the following relief:

A.    An equitable accounting against all the individual defendants in favor of the Company for the injuries that it has sustained and will sustain by virtue of the conduct alleged herein;

27

B.    An equitable accounting against the individual defendants for selling shares of the Company's stock while in possession of material inside adverse information;

C.    Equitable relief against defendants from hereafter engaging in the practices as particularized above;

D.    Voiding the elections of directors for 2006 and also for 2007 and enjoining all candidates from sitting on the Company's board unless and until they shall be elected thereto pursuant to a proper and lawful stockholder vote;

E.    Awarding plaintiff the costs and disbursements of this action, including reasonable accountants', experts' and attorneys' fees; and

F.    Granting such other, further relief, whether similar or different, as by this Court may be deemed just and proper.


BIGGS and BATTAGLIA

Dated: November 6, 2007

By: _____
Robert D. Goldberg (I.D. No. 631)
921 North Orange Street
Wilmington, DE  19899
Tel: (302) 655-9677
Fax: (302) 655-7924
goldberg@batlaw.com
Attorneys for Plaintiff

*Of Counsel*
Barrack, Rodos & Bacine
Alexander Arnold Gershon
Regina M. Calcaterra
Gloria Kui
1350 Broadway, Suite 1001
New York, New York 10018
(212) 688-0782

28

Barrack, Rodos & Bacine
Daniel E. Bacine
Two Commerce Square
2001 Market Street B Suite 3300
Philadelphia, Pennsylvania 19103
(215) 963-0600

P:\Users\Meme\RDG\EFilings\IBEW\BLUMBERG-CPL2.doc

<u>VERIFICATION</u>

I, **Adam Blumberg,** hereby verify that I am the plaintiff in this action. I have reviewed the within Complaint and authorize its filing; and that the facts set forth in the Complaint are true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Dated: October _31_, 2007

Alan Blumberg

%JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

07 - 717

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| ADAM BLUMBERG | ANGELO R. MOZILO, ET. AL. |

**(b)**  County of Residence of First Listed Plaintiff  **Pennsylvania**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)
Robert D. Goldberg Biggs and Battaglia
P.O. Box 1489, Wilmington, DE 19899

Attorneys (If Known)

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN  (Place an "X" in One Box Only)

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district (specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Section 78 n(a)

Brief description of cause:
Derivative Action Claiming Waste and Breach of Fiduciary Duties

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes  ☐ No |
|---|---|---|---|

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE  Unassigned      DOCKET NUMBER  07-372

DATE
11/6/07

SIGNATURE OF ATTORNEY OF RECORD
Robert _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 7 - 7 1 7 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ____ *13* ____ COPIES OF AO FORM 85.

_____ 11/6/07 _____

(Date forms issued)

_____

(Signature of Party or their Representative)

_____

(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action