IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND,<br><br>       Plaintiff,<br><br>       vs.<br><br>ANGELO R. MOZILO, HENRY G. CISNEROS, ROBERT L. DONATO, HARLEY W. SNYDER, JEFFREY M. CUNNINGHAM, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL, MICHAEL E. DOUGHERTY, and COUNTRYWIDE FINANCIAL CORPORATION,<br><br>       Defendants. | CA No. 07 – 00372 *** (MPT)<br><br>       **Jury Trial Demanded** |
| ADAM BLUMBERG,<br><br>       Plaintiff,<br><br>       vs.<br><br>ANGELO R. MOZILO, HENRY G. CISNEROS, ROBERT L. DONATO, HARLEY W. SNYDER, JEFFREY M. CUNNINGHAM, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL MICHAEL E. DOUGHERTY, DAVID SAMBOL, KATHLEEN BROWN and COUNTRYWIDE FINANCIAL CORPORATION,<br><br>       Defendants. | CA No. 07 – 00717 *** (MPT)<br><br>       **Jury Trial Demanded** |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

Dated:  January 15, 2008

BIGGS & BATTAGLIA
ROBERT D. GOLDBERG (#631)
921 North Orange Street
Wilmington, DE 19899
Tel: (302) 655-9677
Fax: (302) 655-7924
goldberg@batlaw.com
*Attorneys for plaintiffs*

*Of Counsel:*

Barrack, Rodos & Bacine
Alexander Arnold Gershon
Regina M. Calcaterra
Gloria Kui
1350 Broadway, Suite 1001
New York, New York 10018
(212) 688-0782

Barrack, Rodos & Bacine
Daniel E. Bacine
William J. Ban
Two Commerce Square
2001 Market Street B Suite 3300
Philadelphia, Pennsylvania 19103
(215) 963-0600

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

NATURE AND STAGE OF THE PROCEEDING ................................................ 1

SUMMARY OF ARGUMENT ....................................................................... 3

STATEMENT OF FACTS ............................................................................ 3

    **1.**    The Defendants ........................................................................ 3

    **2.**    The Connection Between the Price of Homes and Countrywide's Financial

        Condition ............................................................................ 4

    **3.**    The Movement Of The Price of Homes .................................... 6

    **4.**    The Countrywide Board's Possession of Facts .......................... 8

    **5.**    The Board's Causing of Countrywide to Repurchase Its Stock .......... 10

    **6.**    The Board Members' Sale of Their Own Countrywide Stock .......... 12

ARGUMENT ......................................................................................... 13

    **I.**    Pre-suit Demand Is Excused .................................................. 13

    **II.**    The Applicable Standard for Summary Judgment ..................... 15

    **III.**    Plaintiffs Should Have Summary Judgment .......................... 16

    on the Claim for Repurchase of Stock_____ ................................... 16

        **A.**    THE BASIS OF LIABILITY ................................................ 16

        **B.**    THE MEASURE OF RELIEF .............................................. 17

CONCLUSION ...................................................................................... 19

## **TABLE OF AUTHORITIES**

**Cases**

*Applebaum v. Avaya, Inc.*, 812 A.2d 880 (Del. Supr. 2002)...........................................................17

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)..............................................................................14

*Ash v. McCall*, 2000 WL 1370341 (Del. Ch. Sep. 15, 2000)........................................................13

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961 (Del. Ch. 2003)

........................................................................................................................................................13

*Blasband v. Rales*, 971 F.2d 1034 (3d Cir. 1992)........................................................................14

*Brehm v. Eisner*, 746 A.2d 244 (Del. Supr. 2000)................................................................14, 15

*Guth v. Loft, Inc.*, 5 A.2d 503 (Del. Supr. 1939) ........................................................................16

*Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300 (3d Cir. 1995) ................................15

*In re Primedia, Inc.*, 910 A.2d 248 (Del. Ch. 2006)...............................................................16, 18

*In re Stone & Webster Inc.*, 2005 WL 1036556  (D. Del. May 3, 2005) ................................15, 16

*In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. Supr. 2006) ...........................................17

*Kahn v. Tremont Corp.*, 1996 WL 145452 (Del. Ch. Mar. 21, 1996) ..........................................18

*Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991) .................................................14

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007) ....................18

*Needham v. Cruver*, 1993 WL 179336 (Del. Ch. May 12, 1993)................................................14

*Norte & Co. v. Huffines*, 288 F.Supp. 855 (S.D.N.Y. 1968) .......................................................18

*Norte & Co. v. Huffines*, 304 F.Supp. 1096 (S.D.N.Y. 1968), *new trial denied*, 288 F.Supp. 855

(S.D.N.Y. 1968) *aff'd in part, remanded in part*, 416 F.2d 1189 (2d Cir. 1969), *cert. denied*,

397 U.S. 989 (1970)..................................................................................................................17

*O'Neill v. Maytag*, 339 F.2d 764 (2d Cir. 1964) .......................................................................16

*Seinfeld v. Barrett*, 2006 WL 890909 (D. Del. Mar. 31, 2006) ...................................................15

*Shaev v. Saper*, 320 F.3d. 373 (3d Cir. 2003) ............................................................................13

*Stone v. Ritter*, 911 A.2d 362 (Del. Supr. 2006) ..................................................................15, 17

*Strassburger v. Earley*, 752 A.2d 557 (Del. Ch. 2000) ..............................................................18

*Strougo v. Carroll*, 1991 WL 9978 (Del. Ch. Jan. 29, 1991) ......................................................14

*Thorpe v. Cerbco, Inc.*, 676 A.2d 436 (Del. Supr. 1996).......................................................16, 18

## Statutes

Fed. R. Civ. P. 23.1 ......................................................................................................................14

Fed. R. Civ. P. 56(c) ....................................................................................................................15

Plaintiffs, International Brotherhood of Electrical Workers Local 98 Pension Fund

("IBEW") and Adam Blumberg ("Blumberg"), by their attorneys, submit this brief in support of

their motion for partial summary judgment in the above-captioned matter. This motion is

supported by the declaration of Alexander Arnold Gershon, dated January 11, 2008, with exhibits

("Gershon Decl." or the "Gershon Declaration").[1]

## NATURE AND STAGE OF THE PROCEEDING

These are stockholder's derivative actions on behalf of Countrywide Financial Corporation, a

Delaware corporation ("Countrywide" or the "Company"), against its directors.

Plaintiff IBEW commenced its action on June 12, 2007 on the basis of federal question

jurisdiction, supplemental jurisdiction, and diversity. Plaintiff IBEW e-filed an amended complaint

on September 14, 2007. Plaintiff Blumberg commenced his action on November 6, 2007, also on the

basis of federal question jurisdiction, supplemental jurisdiction, and diversity. The two cases are

substantially identical. The Blumberg complaint adds two individual defendants, *i.e.*, Kathleen

Brown, who was a Countrywide director during 2006 until March 29, 2007, and David Sambol, who

became a Countrywide director on September 26, 2007. It also adds allegations concerning

Countrywide's issuance of convertible preferred stock on August 22, 2007. The *IBEW* amended

complaint and the *Blumberg* complaint are referred to herein as the "Complaint." The amount in

controversy exceeds $3.0 billion. The defendants have consented to waiver of service of process in

---

1    Exhibits 5, 6, and 10 to the Gershon Declaration are three pages that Countrywide posted on the Internet as part
of a presentation for a conference call with analysts on July 24, 2007. Those pages are in color on the Internet.
Black and white copies are being e-filed with the Gershon Declaration, but for the convenience of the court and
counsel, plaintiffs are serving and filing hard copies in color because of the high importance of these exhibits, and
the facility with which color makes them easier to read and understand.

Blumberg and to consolidation of these cases. (Defs.' Waiver of Service, D.I. 4; Proposed Order Regarding Date for Defs. to Respond, D.I. 5).

The Complaint alleges that the directors distributed proxy statements for the 2006 and 2007 annual meetings of stockholders seeking the re-election of directors of a staggered board. These proxy statements were materially false or misleading in that they materially understated the compensation of the CEO, defendant Angelo R. Mozilo. The Complaint also alleges that the compensation committee of the board of directors granted stock options to CEO Mozilo that were inconsistent with his employment contract and that it paid him compensation that was grossly excessive.

But the most serious allegation is that at a time when the board of directors was in possession of facts, not known to public investors, concerning material adverse changes in Countrywide's business and assets, the board caused Countrywide to repurchase more than 60 million shares of its own stock, or 9.75% of the total outstanding, at nearly $40 per share, costing Countrywide $2,372,152,000 in cash. During the same period, a majority of the board sold their own shares of Countrywide stock to realize proceeds of approximately $373 million. When the facts concerning Countrywide's financial condition became public, the value of its stock fell to less than $20 per share, causing an out-of-pocket loss on Countrywide's repurchase of approximately $1.3 billion.

Because there are no questions of fact concerning Countrywide's repurchase of its stock, plaintiffs move for partial summary judgment on the repurchase claim.

**SUMMARY OF ARGUMENT**

1.      Pre-suit demand on the board of directors is excused where the directors, who were in possession of facts about material adverse changes in the Company's business, caused the Company to repurchase nearly 10 percent of its outstanding common stock at times when they, individually, sold their own Company stock.

2.      Where, as at bar, there are no issues of material fact, plaintiffs are entitled to summary judgment.

3.      For the directors' breach of their duty of loyalty, the plaintiffs should have summary judgment in favor of the Company against the directors for the greater of rescissory or out-of-pocket damages plus the present value of excess dividends payable on preferred stock issued by the Company after repurchasing its common stock.

**STATEMENT OF FACTS**

1.      **The Defendants**

The Company is incorporated in the State of Delaware.  The Company's stock is listed on the New York Stock Exchange. Its last fiscal year ended on December 31, 2007, but its last annual report on Securities and Exchange Commission ("SEC") Form 10-K was filed March 1, 2007 (Gershon Decl. ¶ 3, Exh. 1.)  As of September 30, 2006, Countrywide reported in its unaudited financial statement on SEC Form 10-Q that it had 616,748,918 shares of common stock outstanding. (Gershon Decl. ¶ 4, Exh. 2, p.3.)  Through its subsidiaries Countrywide is engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, banking and

3

mortgage warehouse lending, dealing in securities, and insurance underwriting. (Gershon Decl. ¶ 3, Exh. 1, p. 1.)

Defendants Angelo R. Mozilo, Henry G. Cisneros, Robert L. Donato, Harley W. Snyder, Jeffrey M. Cunningham, Martin R. Melone, Robert T. Parry, Oscar P. Robertson, Keith P. Russell, and Michael E. Dougherty were all the members of the Company's board of directors when plaintiff IBEW filed the original complaint. Defendants Mozilo, Donato, Snyder, Cunningham, Melone, Parry, Robertson, Russell, and Sambol were all members of the Company's board of directors when plaintiff Blumberg filed his complaint. Defendant Angelo R. Mozilo is now, and has been for many years, the chairman of the board of directors and the Company's chief executive officer. (Gershon Decl. ¶ 6, Exh. 4, p. 7.) Defendant Sambol has been employed by the Company for many years. He is now the Company's president and chief operating officer. (Gershon Decl. ¶ 6, Exh. 4, p. 15.) Defendant Kathleen Brown was a member of the Countrywide board of directors during 2006 and until March 29, 2007. (Gershon Decl. ¶ 6, Exh. 4, p. 8.)

## 2.    The Connection Between the Price of Homes and Countrywide's Financial Condition

Countrywide makes mortgage loans on single family homes, and, accordingly, it is very important to Countrywide that the borrowers repay the loans. But the risk of delinquencies in mortgage loan repayments, which can lead to defaults, is a factor in its business. Countrywide has studied that risk, and it has found that the faster that home prices appreciate, the less chance there is of delinquency in mortgage loan payments. Conversely, the more slowly that home prices appreciate, the greater are the chances of delinquency in mortgage loan payments. And, when home prices

4

actually decline, rather than appreciate, the chances of delinquency mount further. These are facts of cardinal importance to a mortgage lender.

Countrywide has actually compiled the data and prepared graphs that show the correlation between the rate of home price appreciation — or decline, i.e., negative appreciation — and mortgage payment delinquency. Those graphs are attached as Exhibit 5 to the Gershon Declaration and also separately in color. Footnote 1 to the page of graphs states that the data source is Countrywide. The graphs are shown for different kinds of mortgages, i.e., first mortgages, home equity lines of credit ("HELOC") and other second mortgages, fixed and adjustable rate mortgages, and subprime mortgages.[2] They are shown for mortgages with CLTVs, i.e., Combined Loan to Value of the property, ranging from less than 80% to more than 95%. The graphs all show the same thing: The faster that home prices appreciate, the less chance there is of mortgage delinquency, and vice versa. And when home prices decline, the chance of mortgage delinquency skyrockets.

This page of graphs was posted in color on the Internet for an analysts' conference call held by Countrywide on July 24, 2007. Countrywide also posted the text of the conference on the Internet. That text is attached as Exhibit 7 to the Gershon Declaration. At that conference, John McMurray ("McMurray"), Countrywide's chief risk officer, described the graphs at page 3 of Exh. 7, and said:

> Across these four loan types we observe a similar pattern, where high serious delinquency rates are negatively correlated with home price appreciation. The higher the appreciation rate, the lower the serious delinquency.

Thus, even when home prices are appreciating, the risk of mortgage delinquencies will rise if the *rate* of appreciation declines.

---

2.    The vertical scale represents loans in arrears for 90 days or more at the end of the first two years of the loan. The horizontal scale represents the percentage price appreciation, or depreciation, at the end of two years.

5

3.    **The Movement Of The Price of Homes**

By the fourth quarter of 2005 there began a sudden, long-term decline in the rate of home price appreciation, which signaled to Countrywide's board that mortgage delinquencies were poised to rise. In the years between 1992 and 2005, in all metropolitan statistical areas ("MSA") in the United States, as defined by the United States Census Bureau, the weighted average single family residence home price index experienced a year-over-year appreciation calculated for each month. Not only that, there was an increase in the *rate* of appreciation. From 1992 until late 2005, the percentage rate of year-over-year increase itself increased, from less than one percent to nearly 13 percent per year.

The graphic representations of these market conditions, shown as Exhibits 6 and 10 of the Gershon Declaration, and also separately in color, were posted in color on the Internet by Countrywide for its analysts' conference call on July 24, 2007. Exhibit 6 is also marked as Page 1 of the presentation. It is described by McMurray in Gershon Decl. Exh. 7, at Page 2-Page 3, where he explained that the horizontal line at the bottom of Gershon Decl. Exh. 6 shows the 30-year period from 1977 to May 2007. The left vertical line is the percentage of year-over-year rate of appreciation of home prices as measured "each month by looking back exactly one year." The light blue bars "represent a range of year-over-year appreciation by MSA." The top of the light blue bars "represents an average of the five fastest appreciating MSAs. The bottom of each [light] blue bar represents an average of the five slowest appreciating MSAs." McMurray further explained that "[A]pproximately two-thirds of the MSAs will be represented by the darker portion of each blue

bar." In other words, the dark blue portion of the graph shows the range of prices of most of the homes in the United States.

The yellow horizontal line of dashes on Gershon Declaration Exh. 6, at 0% on the vertical scale, represents the place on the graph where there was neither a gain nor loss in year-over-year home prices. The red line "through the middle of the chart represents what is happening to home prices nationally." Gershon Declaration Exh. 7, Page 2-3. McMurray further said, "For May [2007], which is on the far right-hand side of this chart, national home prices actually declined by 0.4% year-over-year. This is the first national decline for the entire [30-year] period shown on this chart." Gershon Declaration Exh. 7 at Page 3.

For most months shown on Gershon Declaration Exh. 6, home prices were actually declining in many MSAs. But "beginning around 1998 and 1999 and continuing into 2006 .... [t]here were essentially no MSAs experiencing price declines .... [But] As of May 2007, the percentage of MSAs with year-over-year price declines is up to 50%." Gershon Declaration Exh. 7 at Page 3. This decline had begun in the fourth quarter of 2005 and was very deep by November 2006. The right vertical scale of Gershon Declaration Exh. 6 is the percentage of MSAs with year-over-year price declines. "The orange area at the bottom of the chart [Gershon Declaration Exh. 6] shows the percentage of MSAs with negative year-over-year appreciation ..." i.e., with price declines.

The red line on Gershon Declaration Exh. 6, representing home prices nationally, is presented as "an uncluttered close up" on Gershon Declaration Exh. 10. It was put on the Internet as Page 2 of the Presentation by Countrywide at the analysts' conference call on July 24, 2007. Gershon

Declaration Exh. 7 at Page 3. As McMurray said, "You can see the steepness of the current decline more prominently in this chart than in the previous chart."

As shown by Gershon Declaration Exh. 10, beginning late 2005 the percentage rate of increase in the year-over-year appreciation began a steady decline. By the beginning of the fourth quarter of 2006, the percentage rate of increase in the year-over-year increase was less than four percent. By the end of 2006, the rate of year-over-year increase in the weighted average single family residence home price index had declined to two percent. By the fourth quarter of 2006, these conditions had put pressure, in the form of rising delinquencies in mortgage payments, on the value of Countrywide's assets and business. (Gershon Declaration ¶7, Exh. 5.) Gershon Decl. Exh. 10 shows the red line extending below the yellow horizontal line in the year 2007 to show that, nationally, home prices had entered a period of year-over-year decline for the first time in 30 years.

### 4.      The Countrywide Board's Possession of Facts

Countrywide's own records show that Countrywide and its board had possession of facts that this decrease in the rate of price appreciation was correlated to a material increase in the delinquency rate on all mortgage loans that Countrywide made, whether to the most creditworthy or most sub-prime borrowers, and that, as an inevitable result, its assets and business had suffered material declines in value. It was Countrywide itself that compiled these data. (Gershon Declaration ¶7, Exh. 5.) Even with the dire situation of the housing market in November 2006 and May 2007, the board of directors still forced the Company to repurchase its own stock at a price that did not reflect its fair market value, given the facts available to the board. And before, during, and after this period, the directors were selling their own stock in the Company. They had the facts that the home price

appreciation rate was at a sharp decline and, in turn, that it was and is causing a high rate of delinquency in every kind of home mortgage loan. (Gershon Declaration ¶7, Exh. 5; ¶ 9, Exh. 7, pp. 2-3.)  These facts, and particularly the functional relationship between the rate of home price appreciation and mortgage payment delinquency, were in the possession of Countrywide's board members.

The directors' attentiveness to Countrywide's business has received comment in the press. *The Wall Street Journal* weekend edition of November 3-4, 2007, reported upon criticism that the Countrywide board was giving itself excessive compensation and the board's response to that criticism.  The following was reported:

> But members of the company's board also have above average compensation....
>
> The pay range is far above median total compensation for directors of the 200-largest U.S. concerns....
>
> Harley Snyder, Countrywide's lead director, said that the board "has been actively engaged in every significant issue facing the company" and that Countrywide has a long history of success.  The board has held 31 meetings this year, not including committee sessions, he said. [Ironically,] Snyder said the directors' shareholdings in the company keep it aligned with the interests of other shareholders.

(Gershon Declaration ¶ 10, Exh. 8.)

On November 12, 2007, *The New York Times* quoted a Countrywide spokesperson making similar comments about the board's compensation and attentiveness.  (Gershon Declaration ¶11, Exh. 9):

> "Countrywide's board of directors has always been actively engaged in overseeing the company's senior management and business strategy," Mr. Simon said.  "Countrywide has an outstanding track record for its financial performance and creation of shareholder value,

and the board deserves credit for the important role it has played in these accomplishments."

Nonemployee directors at Countrywide have also been well compensated for its accomplishments. Every year, they receive cash, stock and other compensation, according to securities filings. Last year, they earned from $345,000 to $539,000 each.

5.    **The Board's Causing of Countrywide to Repurchase Its Stock**

The correct course of action for the Company's directors at the beginning of the fourth quarter of 2006 was to disclose the material adverse changes in the housing market and to make the accounting changes to reflect these facts. Such disclosures would have undoubtedly resulted in a material decrease in the price of Countrywide's common stock to reflect its fair market value. Instead, however, the individual defendants, acting as Countrywide's board of directors, authorized a program for Countrywide to repurchase its common stock and on November 9, 2006 caused Countrywide to purchase 38,639,876 shares for $1,508,596,000, or $39.04 per share. (Gershon Declaration ¶ 3, Exh. 1, p. F-6.) Countrywide's repurchase of 38 million shares of its stock helped to keep the price up, to the benefit of the directors who were in the process of selling their own Countrywide stock.

Pursuant to the program to repurchase stock, in May 2007, Countrywide's board of directors caused it to repurchase 21,503,512 shares of its common stock for $863,556,000, or $40.16 per share. (Gershon Declaration ¶ 4, Exh. 2, p. 3.) At the time of the May 2007 repurchase, home prices nationally were in year-over-year decline for the first time in 30 years. Countrywide's total expenditure in November 2006 and May 2007 was $2,372,152,000.

10

Countrywide's 2006 third quarter SEC Form 10-Q reported that on September 30, 2006, Countrywide had 616,748,918 shares outstanding.[3] Countrywide purchased a total of 60,143,388 of its own shares in 2006 and 2007, or 9.75 percent of the number of shares outstanding. The individual defendants caused Countrywide to pay substantially more for its stock than its value. After Countrywide reported impairment charges of $417 million in the second quarter in 2007 (Gershon Declaration ¶ 9, Exh. 7, p. 2), and as more information about the mortgage problems became known, the market learned the true state of conditions at Countrywide, and the price of its stock fell to approximately half of the price that the directors had forced Countrywide to pay. And then, on August 22, 2007, the directors caused Countrywide to issue 20,000 shares of 7.25 percent preferred stock, convertible into common stock at $18 per share, in exchange for $2 billion in cash. (Gershon Declaration ¶ 5, Exh. 3, p. 2.) This amount of cash is $372 million less than the directors caused Countrywide to pay to purchase its stock, before considering the non-tax-deductible dividends of $145 million per year for this preferred stock. If all the preferred stock is converted, Countrywide will issue 111,111,111 common shares. At $18 per share, the loss to Countrywide is $1,289,571,016, again without considering the preferred dividends. More recently, in the five trading days ending January 11, 2008, Countrywide's stock has been traded in the $5 to $8 range. On January 11, 2008 it was announced that Bank of America would acquire Countrywide for approximately $4 billion, all in stock, or approximately $6.67 per Countrywide share, based on the current price of Bank of America stock.

---

3    This is the number in the unaudited Consolidated Statement of Changes in Shareholders' Equity. The total includes 15,438,630 shares issues pursuant to stock-based compensation plans. In Note 3's subpart Stock-Based Compensation, however, it is reported that 13,120,577 stock options were exercised, 365,456 restrictedshares were granted, and 29.982 restricted shares were cancelled. This equals 13,456,051 shares issued pursuant to stock-based compensation plans, a difference of 1,982,579 shares.

11

Countrywide's repurchase of any of its own stock was a material deviation from its previous history. Countrywide's financial statements reflect that, at least since March 1, 1991, it had never redeemed or repurchased any of its common stock until November 9, 2006. (Gershon Declaration ¶ 13, Exh. 11.) In 2004, there were two separate special meetings of Countrywide's stockholders — on January 9 and August 17 — to vote upon proposals to increase the number of authorized shares of common stock under the certificate of incorporation. In each instance the board of directors solicited stockholders' proxies for the proposals. In each instance the proxy statement omitted to state that common stock would be repurchased by the Company. (Gershon Declaration ¶¶ 14-15, Exhs. 12-13.) The sudden repurchases of its own stock in such large amounts and near its peak price have not been explained by any of the defendants.

**6.    The Board Members' Sale of Their Own Countrywide Stock**

It was bad enough that the directors caused Countrywide to repurchase its own shares after the directors learned that Countrywide's assets and business were exposed to the market risks coincident with a declining rate of appreciation and, even, absolute decline in the weighted average single family residence home price index. Gershon Decl. Exh. 10. Even more egregious was that, during the same period, nine current and former members of the board of directors sold thousands of their own shares of Countrywide common stock for millions of dollars. (Gershon Declaration ¶ 25, Exh. 23.)

CEO Mozilo sold 8,256,964 Countrywide shares for more than $304 million since July 6, 2005, and through and after the time that the individual defendants forced Countrywide to repurchase its own stock. (Gershon Declaration ¶ 16, Exh. 14.) Defendant Dougherty sold 170,929 Countrywide shares for more than $6.8 million between November 29, 2006, and June 15, 2007.

(Gershon Declaration ¶ 17, Exh.15.)  Defendant Snyder sold 120,000 Countrywide shares for

$4,718,040 between April 19, 2006 and December 19, 2006.  (Gershon Declaration ¶ 18, Exh. 16.)

Defendant Robertson sold 272,000 Countrywide shares between November 15, 2005 and July 27,

2007 for $10,215,668.  (Gershon Declaration ¶ 19, Exh. 17.)  Defendant Cunningham sold 75,000

Countrywide shares for more than $3 million between April 3, 2006 and February 2, 2007.  (Gershon

Declaration ¶ 20, Exh. 18.)  Defendant Donato sold 54,142 Countrywide shares for $2,142,068 on

October 27 and December 15, 2006.  (Gershon Declaration ¶ 21, Exh. 19.)  Defendant Cisneros sold

111,479 Countrywide shares between August 8, 2005 and May 30, 2007 for $4,173,776.20.

(Gershon Declaration ¶ 22, Exh. 20.)  Defendant Russell sold 10,000 Countrywide shares on

December 12, 2005 for $371,243.52.  (Gershon Declaration ¶ 23, Exh. 21.)  Defendant Sambol, who

has been a named executive officer since 2005, sold 1,009,825 Countrywide shares between July 8,

2005 and July 19, 2007, for $37,711,725.66.  (Gershon Declaration ¶ 24, Exh. 22.)

## ARGUMENT

### I.    Pre-suit Demand Is Excused

The threshold issue in a stockholder's derivative action is whether the plaintiff has made a

demand on the board of directors to correct the wrong or has alleged facts sufficient to excuse such

demand.  *Shaev v. Saper*, 320 F.3d 373, 377 (3d Cir. 2003.  The demand requirement of each claim

is reviewed separately.  *See Ash v. McCall*, 2000 WL 1370341 at *5 (Del. Ch. Sep. 15, 2000; *Beam*

*ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 fn. 48 (Del. Ch. 2003)

(citing *Needham v. Cruver*, 1993 WL 179336 at *3 (Del. Ch. May 12, 1993)).  Plaintiffs will address

only the stock repurchase claim, which is the only claim that is the subject of the instant motion.

13

In this stockholders' derivative action in federal court, Rule 23.1 of the Federal Rules of Civil Procedure provides the pleading standards for the presuit demand allegations, and state law ordinarily governs the substance of the requirement to make demand. Fed. R. Civ. P. 23.1; *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 98-99, 111 S.Ct. 1711 (1991); *Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir. 1992). The state's law that applies is the state of incorporation, which is Delaware in the case at bar. *Id.* at 1047.

Plaintiffs did not make a demand on the board before filing this lawsuit because it would have been futile, for a majority of the board is interested in the transactions and events alleged. The Complaint alleges that the directors, while in possession of material inside adverse information, caused the Company to repurchase more than 60 million shares, 9.75%, of its outstanding stock, at a price more than double its value. During the same period, the directors sold their own shares of the Company's stock at prices at more than double its value. Inquiry ceases if the majority of the board is interested. *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984); *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. Supr. 2000); *Needham v. Cruver*, 1993 WL 179336 *3 (Del. Ch. May 12, 1993) (defendant directors could not have acted independently to evaluate the merits of the legal action at bar because all but one of the directors received illegally issued stock).

At bar, all but two of the directors sold stock while they caused Countrywide to repurchase its own stock at artificially inflated prices. Moreover, the insider sales of each defendant need not occur simultaneously. If the transactions are substantially identical, this is sufficient "as to the disinterestedness of the majority of the directors [] to consider a pre-suit demand and demand must therefore be excused." *Id.* at *3; *Strougo v. Carroll*, 1991 WL 9978 *4 (Del. Ch. Jan. 29, 1991) (for

14

demand purposes insider trading events should be viewed collectively). The board's conduct therefore excuses demand. *Needham* at *3.

Even if the directors had not sold their own Countrywide stock, it was an act of egregious disloyalty and bad faith, not protected by the business judgment rule, to cause Countrywide to repurchase its stock at times when they were in possession of facts that unambiguously showed that business conditions had so drastically deteriorated. *Brehm v. Eisner*, 746 A.2d at 260. *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. Supr. 2006). Countrywide had not repurchased stock in 15 years. November 2006 and May 2007 were the worst possible times to start.

## II.    The Applicable Standard for Summary Judgment

The standard that applies to a motion for summary judgment is well settled. Rule 56(c) of the Federal Rules of Civil Procedure requires the court to grant summary judgment where, as here, "there is no genuine issue as to any material fact for the jury to decide." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995); Fed. R. Civ. P. 56(c). Once the moving party fulfills its burden of proving that no genuine issue of material fact exists, the nonmoving party must demonstrate "with specific facts showing that there is a genuine issue for trial." *In re Stone & Webster Inc.*, 2005 WL 1036556 *5 (D. Del. May 3, 2005) (internal quotations and citations omitted).

And "[t]he mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue." *In re Stone & Webster Inc.*, at *5; *Seinfeld v. Barrett*, 2006 WL 890909 *4 (D. Del. Mar. 31, 2006) (non-moving party must do more than raise a "metaphysical doubt"). When a non-moving party fails to meet its burden of

proof, "the moving party is entitled to judgment as a matter of law." *In re Stone & Webster Inc.*, 2005 WL 1036556 at *5 (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.    Plaintiffs Should Have Summary Judgment on the Claim for Repurchase of Stock

#### A.    THE BASIS OF LIABILITY

Delaware law has long imposed upon corporate officers and directors a fiduciary duty of loyalty not to use their positions to further their private interests and not to do anything that would work injury to the corporation. *Thorpe v. Cerbco, Inc.*, 676 A.2d 436, 445 (Del. Supr. 1996); *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. Supr. 1939). Causing the company to pay too much to repurchase or redeem its own stock is a violation of the duty of loyalty. In *In re Primedia, Inc.*, 910 A.2d 248, 261-62 (Del. Ch. 2006), controlling persons caused the company to call its preferred stock for redemption long before redemption was mandatory and at redemption prices that materially exceeded the market price. The controlling persons held substantial amounts of the preferred stock. The court held that "[t]he theoretical grounds for damages here are straightforward." In *O'Neill v. Maytag*, 339 F.2d 764, 767 (2d Cir. 1964), the directors forced the Company to acquire shares of its own stock worth $11,115,000 in exchange for consideration worth $12,906,400. Those acquired shares constituted 21 percent of the outstanding shares and posed a threat to the directors' control. The court observed that the directors had in effect used $1,800,000 of the company's assets "to purchase a more favorable control position for themselves." *Id.* at 767. The court held that the allegations in support of the effort to recover the $1,800,000 "obviously state a claim under state law." *Id.*

Similarly, directors violate their fiduciary duty when they cause a company to issue shares of its stock to acquire assets worth less than the issued shares. Thus, in *Norte & Co. v. Huffines*, 304

16

F.Supp. 1096 (S.D.N.Y. 1968), *new trial denied*, 288 F.Supp. 855 (S.D.N.Y. 1968), *aff'd in part, remanded in part*, 416 F.2d 1189 (2d Cir. 1969), *cert. denied*, 397 U.S. 989 (1970), directors forced a corporation to issue shares worth $2,992,940 more than the assets it acquired. The fiduciaries held 77 percent of the assets and received 77 percent of the stock. The court, applying Ohio law, held that the directors were liable to the corporation for the full amount and not just the 77 percent that they received.

At bar, when the directors caused Countrywide to repurchase its own stock, they themselves were selling their own Countrywide stock. When Countrywide sustained out-of-pocket losses on its repurchases, the directors reaped in-pocket gains on their sales. This misalliance of corporate repurchases and directorial sales was "disloyalty in the classic sense," *i.e.*, the directors preferred their own adverse self interest to the interest of Countrywide. *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. Supr. 2006). Moreover, this misalliance of repurchases and sales that the directors effected was not "in the good faith belief that … [their] actions … [were] in the corporation's best interest." *Stone v. Ritter*, 911 A.2d 362, 370 (footnote omitted). To cause Countrywide to buy what defendants chose to sell is the polar opposite of "actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 67.

## B.    THE MEASURE OF RELIEF

The prices at which Countrywide repurchased, and the directors sold, the stock were the market prices on the dates of repurchase and sale. But those prices did not reflect the value of the stock. Market price only equals value when the market is "well-informed." *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 890 (Del. Supr. 2002). The market price may not reflect a stock's fair value if

17

the market is manipulated. *Kahn v. Tremont Corp.*, 1996 WL 145452 at *9 (Del. Ch. Mar. 21,

1996). A "free and open market" is necessary to "make the market a fair reflection of the judgment

of the buying and selling public." *Norte & Co. v. Huffines*, 288 F.Supp. 855, 859 (S.D.N.Y. 1968)

(citing *Application of Marcus*, 79 N.Y.S.2d 76, 78 (1st Dept. 1948), *app. dism.*, 99 N.Y.S.2d 849 (1st

Dept. 1950), *affd.*, 103 N.E.2d 338 (N.Y. 1951)). For "[w]hat can we reason, but from what we

know?" *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 175 (2d Cir. 2007)

(quoting ALEXANDER POPE, AN ESSAY ON MAN)).

The measure of relief against officers and directors for breach of the duty of loyalty must

meet the standard that "a fiduciary not profit personally from his conduct, and that the beneficiary

not be harmed by such conduct." *Thorpe v. Cerbco, Inc.*, 676 A.2d at 445. Moreover, the "damages

flowing from that breach are to be liberally calculated." *Id.* at 444. Delaware public policy seeks to

remove all temptation for fiduciaries to breach their duty of loyalty. To that end, when fiduciaries

breach their duty of loyalty, Delaware law "loosen[s] normally stringent requirements of causation

and damages." *In re Primedia Inc. Deriv Litig.*, 910 A.2d at 262 (citing *Milbank, Tweed, Hadley &*

*McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)).

On this motion for partial summary judgment, plaintiffs seek to recover only for the harm to

Countrywide, leaving for another day the recovery of the profits made by the individual defendants.

On the facts at bar, the measure of recovery for breach of the fiduciary duty of loyalty, where the

fiduciary has made a profit, is rescissory damages, *i.e.*, the difference between the price that

Countrywide paid for its stock and the value of its stock on the date of judgment. *Strassburger v.*

*Earley*, 752 A.2d 557, 579-82 (Del. Ch. 2000). The directors caused Countrywide to repurchase

60,143,388 shares of its stock for $2,372,152,000. In the five trading days ending January 11, 2008,

the market price of Countrywide stock has been between $4.43 and $8.91 per share. Taking $6.50 per share as the value on the date of judgment, which is approximately the price of the Bank of America all stock acquisition, rescissory damages would be $1,981,219,978, calculated by taking the original cost, $2,372,152,000, less $390,932,022, calculated by taking $6.50 per share times 60,143,388 shares. But if the price of Countrywide stock recovers, there should be a floor of $1,289,571,016. This is the difference between the repurchase price of the shares and the $18 conversion price of the preferred stock, times 60,143,388 shares.

The 20,000 shares of convertible preferred stock issued on August 22, 2007, pay a dividend of $145 million per year. The common stock that the directors caused Countrywide to repurchase paid a dividend of $0.60 per share per year, or $36,086,032.80 annually. The dividend difference is $108,913,967.20. Countrywide cannot redeem the preferred stock until August 22, 2017. The present value of the dividend difference for 10 years at an annual interest rate 7 % per annum is approximately $765 million. (Gershon Declaration ¶ 26, Exh. 24.) To make Countrywide whole, it should recover the dividend difference, as well.

## CONCLUSION

The directors of Countrywide breached their fiduciary duties to it by simultaneously causing Countrywide to buy its stock at an inflated price and selling their own Country stock. Summary judgment should therefore be granted in the amount of the greater of

$$
\begin{array}{r}
\$1,289,571,016 \\
\underline{765,000,000} \\
\underline{\$2,054,571,016}
\end{array}
$$

or, the difference between $2,372,152,000 and the value of 60,143,388 of its shares on the date of judgment, plus $765 million.

19

BIGGS and BATTAGLIA

Dated: January 15, 2008

/s/ Robert D. Goldberg
Robert D. Goldberg (#631)
goldberg@batlaw.com
921 North Orange Street
P.O. Box 1489
Wilmington, DE 19899
Telephone: 302.655.9677
Attorneys for Plaintiffs

*Of Counsel:*

    Barrack, Rodos & Bacine
    Alexander Arnold Gershon
    Regina M. Calcaterra
    Gloria Kui Melwani
    1350 Broadway, Suite 1001
    New York, New York 10018
    (212) 688-0782

    Barrack, Rodos & Bacine
    Daniel E. Bacine
    William J. Ban
    Two Commerce Square
    2001 Market Street B Suite 3300
    Philadelphia, Pennsylvania 19103
    (215) 963-0600

20

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98 PENSION FUND, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| ANGELO R. MOZILO, HENRY G. CISNEROS, ROBERT L. DONATO, HARLEY W. SNYDER, JEFFREY M. CUNNINGHAM, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL, MICHAEL E. DOUGHERTY, and COUNTRYWIDE FINANCIAL CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) | CA No. 07 – 00372 *** (MPT) **Jury Trial Demanded** |
| Defendants.<br>_____ | ) ) | |
| ADAM BLUMBERG, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| ANGELO R. MOZILO, HENRY G. CISNEROS, ROBERT L. DONATO, HARLEY W. SNYDER, JEFFREY M. CUNNINGHAM, MARTIN R. MELONE, ROBERT T. PARRY, OSCAR P. ROBERTSON, KEITH P. RUSSELL MICHAEL E. DOUGHERTY, DAVID SAMBOL, KATHLEEN BROWN and COUNTRYWIDE FINANCIAL CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) | CA No. 07 – 00717 *** (MPT) **Jury Trial Demanded** |
| Defendants.<br>_____ | ) ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2008, I electronically filed the foregoing PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

THOMAS A. BECK, ESQUIRE
STEVEN J. FINEMAN, ESQUIRE
RICHARD, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19801

EDWARD P. WELCH, ESQUIRE
EDWARD B. MICHELETTI, ESQUIRE
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, DE 19899-0636

**BIGGS & BATTAGLIA**

/s/ Robert D. Goldberg
ROBERT D. GOLDBERG (#631)
921 North Orange Street
Wilmington, DE 19899
Tel: (302) 655-9677
Fax: (302) 655-7924
goldberg@batlaw.com
*Attorneys for plaintiffs*

*Dated:  January 15, 2008*